CASE OF BRODERICK'S WILL.

1. A court of equity has not jurisdiction to avoid a will or to set aside the probate thereof on the ground of fraud, mistake, or forgery; this being within the exclusive jurisdiction of the courts of probate.

---

* 17 Wallace, 473.

2. Nor will a court of equity give relief by charging the executor of a will or a legatee with a trust in favor of a third person, alleged to be defrauded by the forged or fraudulent will, where the court of probate could afford relief by refusing probate of the will in whole or in part.

3. The same rule applies to devises of real estate, of which the courts of law have exclusive jurisdiction, except in those States in which they are subjected to probate jurisdiction.

4. *Semble* that where the courts of probate have not jurisdiction, or where the period for its further exercise has expired and no laches are attributable to the injured party, courts of equity will, without disturbing the operation of the will, interpose to give relief to parties injured by a fraudulent or forged will against those who are in possession of the decedent's estate or its proceeds, *malâ fide*, or without consideration.

5. But such relief will not be granted to parties who are in laches, as where from ignorance of the testator's death they made no effort to obtain relief until eight or nine years after the probate of his will.

6. Ignorance of a fraud committed, which is the ordinary excuse for delay, does not apply in such a case, especially when it is alleged that the circumstances of the fraud were publicly and generally known at the domicile of the testator shortly after his death.

7. Whilst alterations in the jurisdiction of the State courts cannot affect the equitable jurisdiction of the Circuit Courts of the United States, so long as the equitable rights themselves remain, yet an enlargement of equitable rights may be administered by the Circuit Courts as well as by the courts of the State.

APPEAL from the Circuit Court for the District of California.

This was a suit in equity brought by the alleged heirs-at-law of David C. Broderick, late United States Senator from California, to set aside the probate of his will, and have the same declared a forgery, and to recover the said Broderick's estate, much of which consisted of lands now comprised in the thickly settled portions of the city of San Francisco.

The complainants were John Kieley and Mary, his wife, George Wilson and Ann, his wife, and Ellen Lynch, all residents of Sidney, in New South Wales, and subjects of Great Britain and Ireland. They alleged that Mary Kieley, Ann Wilson, and Ellen Lynch were, at the death of Broderick, his next of kin and only heirs-at-law, being daughters of Catharine Broderick, sister of Thomas Broderick, the father of the said David.

There were several hundred defendants, who were in possession of and claiming as owners the property in question. John A. McGlynn, one of the executors who propounded the will and procured its probate, was also one of the defendants.

The bill was filed on the 16th of December, 1869, and stated that Broderick died on the 16th of September, 1859, intestate, being at the time a citizen of the United States and a resident of San Francisco, in California, seized and possessed of real and personal property in said State. Then, after stating the relationship and status of the complainants, the bill proceeded to allege that at the time of his death, Broderick was seized of the real estate set out in the schedule annexed to the bill, and was possessed of personal property to the amount of $20,500, also set forth in a schedule.

It then alleged that on the 20th day of February, 1869, the defendant McGlynn, on behalf of himself and one A. J. Butler, presented to the Probate Court of San Francisco a certain paper writing (a copy of which was annexed) which they falsely pretended was the last will and testament of the said Broderick, in which the said McGlynn, Butler, and one George Wilkes were named as executors, and, at the same time, presented their petition in writing, whereby they prayed the court to admit the said will to probate, and issue to them letters testamentary, knowing, at the time, that the said paper was a forgery. And the bill charged the fact to be that it was a forgery, and not Broderick's will; that it was forged about the 1st of January, 1860, after his death, for the purpose of defrauding his legal heirs, and that it was written by one Alfred Phillips, and that the name of Broderick was signed thereto by one Moses Flanagan. The bill then proceeded to state as follows:

" That the said Butler, well knowing that the said paper was a forgery, caused it to be presented as aforesaid, as the genuine, true, and valid will of the said Broderick, and caused a commission to issue under the seal of the said Probate Court, to a commissioner of the State of California residing in New York City,

to take the testimony, reduce to writing, and return it to the said Probate Court, of John J. Hoff and Alfred A. Phillips, whose names appear as subscribing witnesses to said paper; and their testimony was so taken and returned, to the effect and purport that the name of the said Broderick signed to said instrument was the genuine signature of the said Broderick, and that he did sign, seal, publish, and declare the said instrument to be his last will and testament, in the presence of the said witnesses; and that they did sign the same, as witnesses, at his request, in his presence and in the presence of each other; and the said Butler did, also, procure and present to said court the testimony of certain experts in handwriting, who testified to said court that, in their opinion, the name of Broderick, subscribed to the said paper, was in the genuine handwriting of the said Broderick; he, the said Butler, well knowing that the same was not the genuine handwriting of said Broderick, and the same was not in truth and fact the genuine handwriting of said Broderick; and by means of such false testimony (your orators not having any notice in fact of said proceedings, and no one appearing in their behalf) they did obtain the order and judgment of the said court admitting the said will to probate, as the genuine last will and testament of the said Broderick, and granting letters testamentary to Butler (now deceased) and McGlynn, as executors of said last will and testament, and they proceeded to act as such executors, and allowed and procured to be approved by the probate judge claims against the said estate to the amount of $80,000.

"And afterward the said Butler and McGlynn caused application to be made to said Probate Court for, and obtained, an order of sale of the estate of the said Broderick, deceased, under which they sold the whole of the said estate. That at the time of said sale, which took place in the city and county of San Francisco, it was a matter of public and general notoriety that the said pretended last will and testament of said Broderick, under and by virtue whereof all said probate proceedings were taken and said property sold, was not the will of said Broderick, but was a forged and simulated paper, and all of those who purchased at the said sale, and the defendants and those through whom they deraign title subsequent to the said sale, purchased and acquired whatever interest they have or had with full notice of the frauds hereinbefore alleged."

It appeared by a subsequent statement that the will was admitted to probate on the 8th of October, 1860, and that the sale referred to took place November 7th, 1861.

The bill then alleged that the complainants had no knowledge or information of Broderick's death, nor of the forgery of the will, nor of its presentation for probate, nor of the probate or order of sale, nor of any of the proceedings, until the last day of December, 1866, within three years of filing the bill; and that since that time they had been diligently endeavoring to discover the facts and the evidence relating thereto.

The bill charged that the defendants claimed as owners or were in possession of some portion of Broderick's estate, deriving their only title or claim thereto by or under the probate sales and conveyances as made by the said pretended executors by virtue thereof; that Butler was dead, and that Wilkes no longer had any interest.

It then prayed an answer to several specific interrogatories, as, namely, whether the several defendants did not know, or had not been informed, that the probated paper was a forged instrument? Whether it was not, in fact, forged, and not the will of Broderick? Whether it was not fabricated after his death, as stated in the bill? Whether Butler did not cause it to be propounded for probate, knowing it to be a forgery? Whether he did not procure the testimony and probate, and sell the property by virtue of orders of said Probate Court, as stated? And that McGlynn and others, who took part in the probate sale of the property, might set forth the details thereof, the time when sold, the amounts received, and the disposition of the proceeds.

It prayed further that the will might be declared a forgery; that the probate and all subsequent proceedings might be set aside and annulled, including the decrees of probate, sale, &c., or that the defendants, purchasers of lands and lots under the said orders of sale, or deraigning title therefrom, might be charged as trustees for the complainants, and might be compelled to convey to them, or that a com-

missioner be appointed to make such conveyance, and for general relief.

By the will in question, a copy of which was annexed to the bill, the testator, after payment of his debts, gave to his friend, John A. McGlynn, $10,000, and all the residue of his estate to George Wilkes, of New York, and made Wilkes, McGlynn, and Butler executors. It purported to be dated at New York, January 2d, 1859.

Many of the defendants answered the bill, denying all knowledge or belief of any fraud or forgery in the will, and claiming to be *bonâ fide* purchasers without any notice of any such fraud or forgery. Many other defendants demurred to the bill.

In August, 1871, an amended bill was filed, whereby the complainants reiterated with much particularity the facts that they never resided in California or the United States, and never heard, or had any opportunity of hearing of Broderick's death, or the events connected with the probate of the will, until more than eight years after its being filed for probate, being illiterate, and living in a remote and secluded region in Australia, and stating other facts of the same general character to account for their not having sooner taken any proceedings to assert their rights.

Demurrers were also filed to the bill as amended, and upon the argument of these demurrers the bill was dismissed by the Circuit Court. From that decree the present appeal was taken.

The grounds relied on by the defendants on the demurrer, and by the appellees here, were—

1st. That a court of equity had no jurisdiction of the subject-matter of this suit, the same being vested exclusively in the Probate Court of the City and County of San Francisco.

2d. That the action was barred by several statutes of limitation of the State of California.

3d. That the defendants were purchasers at a judicial sale, made under the orders of a court of competent jurisdiction, never reversed or set aside, and not impeached by the bill.

4th. That the complainants were non-resident foreigners, incapable of taking or holding property in California.

The special character of the Probate Court of the City and County of San Francisco, and the provisions of the several statutes of California about it, and also as to limitations, are set forth in the opinion of the court.*

*Mr. I. T. Williams (a brief of Mr. S. H. Phillips being filed), for the appellants; Mr. S. M. Wilson, contra.*

Mr. Justice BRADLEY delivered the opinion of the court.

As to the first point, it is undoubtedly the general rule, established both in England and this country, that a court of equity will not entertain jurisdiction of a bill to set aside a will or the probate thereof. The case of *Kerrick* v. *Bransby*,† decided by the House of Lords in 1727, is considered as having definitely settled the question. Whatever may have been the original ground of this rule (perhaps something in the peculiar constitution of the English courts) the most satisfactory ground for its continued prevalence is, that the constitution of a succession to a deceased person's estate partakes, in some degree, of the nature of a proceeding *in rem*, in which all persons in the world who have any interest are deemed parties, and are concluded as upon *res judicata* by the decision of the court having jurisdiction. The public interest requires that the estates of deceased persons, being deprived of a master, and subject to all manner of claims, should at once devolve to a new and competent ownership; and, consequently, that there should be some convenient jurisdiction and mode of proceeding by which this devolution may be effected with least chance of injustice and fraud; and that the result attained should be firm and perpetual. The courts invested with this jurisdiction should have ample powers both of process and investigation, and sufficient opportunity should be given to check and revise proceedings tainted with mistake, fraud, or illegality. These objects

---

* *Infra*, p. 515–519.    † 3 Brown's Parliamentary Cases, 388.

are generally accomplished by the constitution and powers which are given to the probate courts, and the modes provided for reviewing their proceedings. And one of the principal reasons assigned by the equity courts for not entertaining bills on questions of probate is, that the probate courts themselves have all the powers and machinery necessary to give full and adequate relief.

In England after the acts of Parliament had authorized devises of real estate, the same position was assumed by courts of equity in regard to such devises; it being held that any fraud, illegality, or mistake affecting their validity could be fully investigated and redressed in the courts of common law, where only devises were cognizable.

An occasional exception, or apparent exception, to this non-interference of courts of equity with wills and devises is found in the books; but these occasional departures from the rule are always carefully placed on such special grounds that they tend rather to establish than to weaken its force. One of the most prominent cases adverted to is *Barnesley* v. *Powel*,* in which an executor and residuary legatee had procured probate of a forged will by fraudulently inducing the testator's son, the person most directly interested, to execute a deed consenting to its probate, and Lord Hardwicke declared the deed void, and compelled the executor to consent, in the ecclesiastical court, to a revocation of the probate. But in doing this his lordship made a labored argument to show that the ecclesiastical court had no power to annul that deed, and that had it attempted to do so the common-law courts would have restrained it by prohibition.

It has also been held that where a person obtains a legacy by inserting his own name in the will, instead of that of the intended legatee, he may be declared a trustee for the latter.† In such a case the Court of Probate could not furnish a remedy, since to strike the bequest out of the will, or to refuse probate of it, would defeat the legacy altogether; and that court is incompetent to declare a trust.

---

* 1 Vesey, 284.          † Mariott *v.* Mariott, 1 Strange, 666.

The English authorities were fully discussed by Lord Lyndhurst in *Allen* v. *McPherson*,\* and by him and Lords Cottenham, Brougham, Langdale, and Campbell in the same case on appeal in the House of Lords.† In that case a codicil was revoked by a subsequent one, in consequence of false and fraudulent representations on the part of the person to be benefited by the change, prejudicing the testator against the person injured thereby. A bill was filed praying that the executor might be declared trustee for the first legatee to the extent of the legacies revoked. This bill was demurred to and dismissed; and the whole discussion turned upon the question whether or not the ecclesiastical court had jurisdiction to inquire of the matters of fraud alleged; and the court being of opinion that it had jurisdiction, the decree was affirmed. The court came to the conclusion that the ecclesiastical court had power to refuse probate of the revoking codicil, and, indeed, had had the question before it; but after investigating the facts had granted the probate. "If," said Lord Lyndhurst, "an error has been committed in this or any other respect, which I am very far from supposing, that would not be a ground for coming to a court of equity. The matter should have been set right upon appeal. But the present is an attempt to review the decision of the Court of Probate, not by the judicial committee of the Privy Council, the proper tribunal for that purpose, but by the court of chancery. I think this cannot be done. It was formerly, indeed, considered that fraud in obtaining a will might be investigated and redressed in a court of equity; but that doctrine has long since been overruled."‡ Lord Lyndhurst also reviewed the cases in which a legatee or executor had been declared trustee for other persons, and came to the conclusion that they had been either questions of construction, or cases in which the party had been named a trustee, or had engaged to take as such, or in which the Court of Probate could afford no adequate or proper remedy. The effect of his reasoning was, that

---

\* 1 Phillips, 133.   † 1 House of Lords Cases, 191.   ‡ Ib. 209.

where a remedy is within the power of the ecclesiastical court, either by granting or refusing probate of the whole will or codicil, or of any portion thereof, a court of equity will not interfere. And this was the view of a majority of the law lords on that occasion, Lords Brougham and Campbell agreeing with Lord Lyndhurst.

It seems, therefore, to be settled law in England that the court of chancery will not entertain jurisdiction of questions in relation to the probate or validity of a will which the ecclesiastical court is competent to adjudicate. It will only act in cases where the latter court can furnish no adequate remedy.

It is laid down in the *Duchess of Kingston's Case,*\* it is true, that fraud will vitiate the most solemn adjudications of all courts; and so it will when set up in the proper manner by the proper parties and in the proper court. But a person who in contemplation of law has had a day in court, and an opportunity to set up the fraud, and has not done so, is forever concluded, unless he was ignorant of its perpetration, in which case he will be entitled to set it up whenever he discovers it, if not himself guilty of laches.

The same principles substantially have been adopted by most of the courts having equity jurisdiction in this country. The point was considerably discussed in the case of *Gaines* v. *Chew and Relf.*† That was a bill filed by the heir at law of Daniel Clark, and charged that a certain will made by him in 1813 was fraudulently suppressed, that another will made in 1811 was fraudulently set up and admitted to probate, and that the defendants, some of whom were executors of the latter will, and others purchasers of the estate, knew the fraud and could furnish the facts to establish the same, and had received large rents and profits from the estate, of all which the bill sought a discovery, and an account of profits received. The bill was demurred to, and on a division of opinion between the judges of the Circuit Court the case came to this court on several questions stated,

---

\* 20 Howell's State Trials, 544.        † 2 Howard, 619.

one of which was, whether the Circuit Court as a court of equity could entertain jurisdiction without probate of the suppressed will.   Justice McLean, delivering the opinion of the court, said : " Formerly it was a point on which doubts were entertained, whether courts of equity could not relieve against a will fraudulently obtained.   And there are cases where the chancery has exercised such a jurisdiction. . . . In other cases such a jurisdiction has been disclaimed, though the fraud was fully established. . . . In another class of cases the fraudulent actor has been held a trustee for the party injured. . . . These cases [referring to various cases cited in the opinion] present no very satisfactory result as to the question under consideration.   But since the decision of *Kerrick* v. *Bransby*,* and *Webb* v. *Claverden*,† it seems to be considered settled, in England, that equity will not set aside a will for fraud and imposition.   The reason assigned is, where personal estate is disposed of by a fraudulent will, relief may be had in the ecclesiastical court; and, at law, on a devise of real property. . . . In cases of fraud equity has a concurrent jurisdiction with a court of law, but in regard to a will charged to have been obtained through fraud, this rule does not hold.   It may be difficult to assign any very satisfactory reason for this exception.   That exclusive jurisdiction over the probate of wills is vested in another tribunal, is the only one that can be given."   After referring to several cases, the judge proceeds: " The American decisions on this subject have followed the English authorities. And a deliberate consideration of the question leads us to say that both the general and local law [of Louisiana] require the will of 1813 to be proved before any title can be set up under it."   The court, however, sustained the bill as a bill of discovery to assist the complainants in their proofs before the Court of Probate, and intimate, on the authority of *Barnesley* v. *Powell*, that if the Probate Court should refuse to take jurisdiction from a defect of power to bring the parties before it, lapse of time, or any other ground, and

---

* 3 Brown's Parliamentary Cases, 385.          † 2. Atkyns, 424.

there should be no remedy in the higher courts of the State, it might become the duty of the Circuit Court, having the parties before it, to require them to go to the Court of Probate, and consent to the proof of the will of 1813 and the revocation of the will of 1811; and the judge also went so far as to intimate further that should this procedure fail it might be a matter of grave consideration whether the inherent powers of a court of chancery might not afford a remedy, where the right was clear, by establishing the will of 1813. Of course, the latter expressions were *obiter dicta,* and can hardly be said to have the support of any well-considered cases. But the matter decided by the court, and the burden of the opinion, is in strict accord with the settled conclusions of the English courts.

Without quoting from the decisions of the various State courts it is sufficient to refer to the case of *California* v. *McGlynn,** on the very will now in question. That case was founded on an information for an escheat of Broderick's estate, and a bill in equity at the suit of the State against the executors of the will, praying for an injunction to restrain them from selling the property of Broderick, and from intermeddling therewith. The principal frauds set up in the present case were set up in that, and a preliminary injunction, granted by the District Court, was dissolved by the Supreme Court on appeal on the ground that the probate of the will belonged to the exclusive jurisdiction of the Probate Court, and having been decided by that court was *res judicata,* and could not be reviewed by the court of chancery. The opinion of the court, delivered by Justice Norton, is quite elaborate, and arrives at the following conclusion: "Upon examining the decisions of the Supreme Court of the United States, and of the courts of the several States, it will be found that they have uniformly held that the principles established in England apply and govern cases arising under the probate laws of this country; and that in the United States, wherever the power to probate a will is given

* 20 California, 233, 266.

to a probate or surrogate's court the decree of such court is final and conclusive, and not subject, except on an appeal to a higher court, to be questioned in any other court, or be set aside or vacated by the court of chancery on any ground."

The judge further stated what the statutes of California demonstrate, that in that State the jurisdiction of the Probate Court is the same in regard to wills of real estate as to wills of personal estate, both classes requiring probate, and the probate of each having the same validity and effect. This is the case in several, perhaps the greater number, of the United States. In some of the older States, as in England, the probate of a will has no effect upon devises of real estate therein, except perhaps to stand as *primâ facie* proof of its execution. But in many States wills of real and personal estate are placed upon the same footing in respect to probate and authentication. It is true the estate in lands devised goes to the devisee and not to the executor, but that is the only difference in the effect of the will or probate as respects the two classes of property.

There is nothing in the jurisdiction of the probate courts of California which distinguishes them in respect of the questions under consideration from other probate courts. They are invested with the jurisdiction of probate of wills and letters of administration, and all cognate matters usually incident to that branch of judicature. The constitution of the State as originally adopted in 1849, provided that the judicial power of the State should be vested in a supreme court, district courts, county courts, and justices of the peace, and that the legislature might establish such municipal and other inferior courts as might be deemed necessary.* It also ordained that there should be elected in each of the organized counties one judge, who should hold his office for four years, and should hold the county court, and perform the duties of surrogate or probate judge.†

These provisions were somewhat modified in September,

---

* Article 5, § 1.         † Article 6, § 8.

1862, but not in any manner material to this case. Moreover the will in question was admitted to probate in October, 1860, before any modification took place. The act of the legislature in force at that time, on the subject of probate, was the act of May 1st, 1851, entitled "An act to regulate the settlement of the estates of deceased persons." By this act as it stood in 1860, having been somewhat modified by sundry amendments, it was declared that the county courts, when sitting for the transaction of probate business, should be known and called the "Probate Court," and the county judge should be *ex officio* probate judge. The mode of procedure for the probate of wills was pointed out. A petition was to be filed in the proper court by the executor or other person interested; and a day appointed for proving the will, not less than ten nor more than thirty days distant; and notice was to be published not less than twice a week in a newspaper published in the county, if there was one; if not, then by posting in three public places in the county.* Citations were also to be issued to the heirs, if they resided in the county, and to any executors named in the will and not joining in the application for probate. Subpœnas were to be issued to the witnesses if they resided in the county. Any person interested might appear and contest the will; and if it should appear that there were minors or non-residents of the county interested, the court was to appoint an attorney to represent them. If any person should appear and contest the will he must file a statement in writing of the grounds of his opposition. Issues when formed were to be sent to the District Court for trial by jury, unless the parties consented to a trial in the Probate Court.† Incompetency, restraint, undue influence, fraudulent representations, and any other cause affecting the validity of the will, are specially mentioned as questions upon which issues might thus be formed. Various provisions were added calculated to secure a thorough investigation on the merits.‡

---

* Hittell's Laws of California, Article "Probate Act," chap. 2, §§ 4–13.
† Ib. §§ 16–20.                              ‡ Ib. § 20.

It was further provided, that when a will had been admitted to probate, any person interested might at any time within one year after such probate, contest the same or the validity of the will, by filing in the same court a petition containing his allegations against its validity or the sufficiency of the proof, and praying that the probate might be revoked. Hereupon new citations were to be issued and a new trial had. But it was declared that if no person should within one year appear to contest the will or probate, the latter should be conclusive, saving to infants, married women, and persons of unsound mind, a like period of one year after disability removed.*

In view of these provisions, it is difficult to conceive of a more complete and effective probate jurisdiction, or one better calculated to attain the ends of justice and truth.

The question recurs, do the facts stated in the present bill lay a sufficient ground for equitable interference with the probate of Broderick's will, or for establishing a trust as against the purchasers of his estate in favor of the complainants? It needs no argument to show, as it is perfectly apparent, that every objection to the will or the probate thereof could have been raised, if it was not raised, in the Probate Court during the proceedings instituted for proving the will, or at any time within a year after probate was granted; and that the relief sought by declaring the purchasers trustees for the benefit of the complainants would have been fully compassed by denying probate of the will. On the establishment or non-establishment of the will depended the entire right of the parties; and that was a question entirely and exclusively within the jurisdiction of the Probate Court. In such a case a court of equity will not interfere, for it has no jurisdiction to do so. The Probate Court was fully competent to afford adequate relief.

But the complainants allege that in consequence of circumstances beyond their control, and without their fault, they had no knowledge or information of Broderick's death,

---

* Hittell's Laws of California, Article "Probate Act" chap. 2, §§ 30–36.

and, of course, no knowledge of the forgery of his will until within three years prior to the commencement of this suit, and after the period for contesting the will in the Probate Court had expired, and when the power of said court to investigate the subject further had ceased. They therefore insist that as the Probate Court had no further jurisdiction over the subject, a court of equity was competent to give relief as against parties having possession of the estate or its proceeds *malâ fide* or without consideration.

Concede this to be true to a certain extent where injured parties have not lost their opportunity of appearing in the Court of Probate or in the equity court by any laches of their own; still it cannot help the complainants. What excuse have they for not appearing in the Probate Court, for example? None. No allegation is made that the notices were fraudulently suppressed, or that the death of Broderick was fraudulently concealed. The only excuse attempted to be offered is, that they lived in a secluded region and did not hear of his death, or of the probate proceedings. If this excuse could prevail it would unsettle all proceedings *in rem*.

But even admitting that, as to surplus proceeds, and property undisposed of, or acquired by those having actual knowledge of the fraud, the complainants might come into a court of equity on the ground of their own ignorance of the events when they transpired, they would still have to encounter the statute of limitations, which expressly declares that action for relief on the ground of fraud can only be commenced within three years; and the statutes of limitation in California apply to suits in equity as well as to actions at law.* It is true that it is added that the cause of action in such case is not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud. But that is only the application to cases at law of a principle which has always been acted upon in courts of equity. If fraud is kept concealed so as not to come to the knowledge of the party injured, those courts will not

---

* Boyd v. Blankman, 29 California, 19.

charge him with laches or negligence in the vindication of his rights until after he has discovered the facts constituting the fraud. And this is most just. But that principle cannot avail the complainants in this case. By their own showing their delay was due, not to ignorance of the fraud, nor any attempt to conceal it, but to ignorance of Broderick's death, and all the open and public facts of the case. They admit, and expressly charge, that it was a matter of public notoriety at San Francisco, as early as 1861, that the will in question was not Broderick's will, but was a forged and simulated paper. They do not pretend that the facts of the fraud were shrouded in concealment, but their plea is that they lived in a remote and secluded region, far from means of information, and never heard of Broderick's death, or of the sale of his property, or of any events connected with the settlement of his estate, until many years after these events had transpired. Parties cannot thus, by their seclusion from the means of information, claim exemption from the laws that control human affairs, and set up a right to open up all the transactions of the past. The world must move on, and those who claim an interest in persons or things must be charged with knowledge of their status and condition, and of the vicissitudes to which they are subject. This is the foundation of all judicial proceedings *in rem.*

The fact that two of the complainants are married women does not take them out of the operation of the statute of limitations of California. They are only exempt when it is necessary that their husbands should join them in the suit. This is not necessary by the law of the State where they sue for their separate estate, as in the present case. As to such property they act as *femes sole.* This suit, had it lain at all, could have been brought by the complainants, who are married women, though their husbands had refused to join them therein.

The statute of 1862 has been referred to, which gives to the District Courts of California power to set aside a will obtained by fraud or undue influence, or a forged will, and any probate obtained by fraud, concealment, or perjury.

Whilst it is true that alterations in the jurisdiction of the State courts cannot affect the equitable jurisdiction of the Circuit Courts of the United States, so long as the equitable rights themselves remain, yet an enlargement of equitable rights may be administered by the Circuit Courts, as well as by the courts of the State. And this is probably a case in which an enlargement of equitable rights is effected, although presented in the form of a remedial proceeding. Indeed, much of equitable jurisdiction consists of better and more effective remedies for attaining the rights of parties. But the statute referred to cannot affect this suit, inasmuch as the statute of limitations would still apply in full force, and would present a perfect bar to the suit.

We can perceive no ground on which the bill in this case can be sustained.

DECREE AFFIRMED.


Mr. Justice SWAYNE specially concurring.


Mr. Justice CLIFFORD, with whom concurred Mr. Justice DAVIS, dissenting:

I dissent from the opinion and judgment of the court in this case for the following reasons: (1.) Because courts of equity may exercise jurisdiction to set aside and annul a decree of the Probate Court approving and allowing an instrument purporting to be the last will and testament of a deceased person, in a case where it appears that the instrument is a forgery and that the decree approving and allowing the instrument was procured by perjury and fraud, provided it appears that the injured party has not been guilty of laches and that he has no other adequate remedy. (2.) Because all the leading authorities cited to support the opposite rule admit that the jurisdiction does exist in cases where there is no other remedy. (3.) Because the right of the complainants in this cause is not barred by the statute of limitations.